```
          IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF IOWA
                   DAVENPORT DIVISION
```

MARCUS MILLS,                    )   No. 3:10-cv-112-RP-RAW
                                 )
       Plaintiff,                )
                                 )
vs.                              )   RULING ON PLAINTIFF'S
                                 )   MOTION TO COMPEL
THE STATE OF IOWA, JAMES         )   DISCOVERY
BRYANT, THE STOLAR               )
PARTNERSHIP, LLP, and SALLY      )
MASON, BONNIE CAMPBELL and       )
DOUGLAS TRUE, in their           )
official and individual          )
capacities,                      )
                                 )
       Defendants.               )

The above motion [69], resisted by the State and Stolar defendants ("Stolar"), is before the Court. The Court rules on the motion papers. LR 7.c.

<u>Evasive Response - Sanction</u>

Plaintiff first argues that the State defendants should be sanctioned for an incomplete response to two of his requests for production. The issue concerns notes of Tom Evans, Board of Regents ("the Board") General Counsel who at the request of the Board conducted a review of the University's response to the alleged sexual assault which triggered the events in issue, and of the person who assisted him in conducting interviews, Tim Cook. In responding to document requests the State defendants did not produce any notes generated by Mr. Evans or Mr. Cook. By letter dated March 30, 2012 plaintiff's counsel inquired about the omission. He was told the State defendants had previously

identified all documents relating to Mr. Evans and that the State defendants believed they had produced all documents pertaining to Tim Cook.

At Mr. Evans' deposition on April 19, 2012 it was revealed that Mr. Evans had made written notes concerning his review but had lost them prior to the receipt of a document preservation request from plaintiff's counsel and was unable to find them. He also testified, however, that he retained Mr. Cook's notes in his possession. Mr. Evans' deposition was halted and Mr. Cook's notes were retrieved and provided to plaintiff's counsel. The deposition resumed with Mr. Cook's notes in hand. In an affidavit accompanying the State defendants' resistance, Mr. Evans states that he thought he had produced all of the documents in the possession of the Board of Regents which had been requested in this case or in the similar *Jones* litigation and was not aware his notes or Mr. Cook's notes were an issue until the time of his deposition.

Plaintiff argues the State defendants should be sanctioned because their failure to timely disclose the fact Mr. Evans had lost his notes or to timely produce Mr. Cook's notes amounted to an evasive or incomplete response under Fed. R. Civ. P. 37(a)(4). The discovery failure did amount to an incomplete disclosure for the purposes of the rule just cited, but a Rule 37 sanction is inappropriate because the incomplete disclosure, when brought to the attention of the State defendants, was promptly

corrected prior to the filing of the motion to compel. Nor will the Court employ its inherent power to impose a sanction. On this record the State defendants are entitled to the benefit of the doubt that the discovery failure was the result of honest mistake.

<u>Waiver of Objections</u>

The defendants have advanced objections to plaintiff's requests for production of documents on the basis of attorney-client privilege and the work-product doctrine, the focus of the present motion. The objections were not made within the time provided for response or objection in Fed. R. Civ. P. 34(b)(2)(A). As plaintiff notes, Rule 34 does not have an objection waiver provision like Rule 33(b)(4) pertaining to responses to interrogatories. While the cases cited by the parties reveal some courts have found waiver of objections when not timely made in response to a request for production, other courts have found waiver only when something beyond delay is involved. This Court is particularly reluctant to find waiver of privilege objections unless truly warranted because of the important policies served by the attorney-client privilege and work-product doctrine. *See Carlson v. Freightliner*, 226 F.R.D. 343, 363 (D. Neb. 2004)(sanction of waiver "most suitable for cases of unjustified delay, inexcusable conduct, and bad faith"); 8 C. Wright, A. Miller & R. Marcus, *Federal Practice and Procedure: Civil* § 2016.1 at 328-331 (2010 & 2012 Supp. at 32).

On November 23, 2011 and December 5, 2011 plaintiff propounded his first requests for production of documents to Stolar and the State defendants. The parties agreed discovery which had already taken place in the *Jones* lawsuit would be used in this lawsuit. What appears to have been a rolling process of production began. The State defendants produced documents on January 23 and February 3, 2012. They served their formal responses on February 8, 2012 in which they made attorney-client privilege and work-product protection objections. At the same time the State defendants produced a privilege log, the adequacy of which plaintiff disputes. Stolar produced documents on February 1, 2012 and February 8, 2012. At the time Stolar's counsel advised his client would be withholding documents on the basis of the attorney-client privilege and work-product doctrine and promised a privilege log. Stolar served its responses to plaintiff's requests on March 12, 2012 and has relied on the State defendants' privilege log. Counsel for Stolar states the parties have not held each other to firm deadlines, plaintiff did not object to the rolling disclosure, or demand formal responses by a date certain. Counsel also states the parties discussed the attorney-client and work-product issues which had been litigated in the *Jones* case, and that the same issues would be raised in this case was understood.

The Court does not perceive any dilatory or bad faith behavior on the part of the defendants in responding to plaintiff's requests for production. That attorney-client and work-product issues would be raised by the defendants in connection with plaintiff's requests was anticipated. The delay was not prejudicial. In these circumstances the Court will not find waiver of the attorney-client privilege and work-product doctrine objections by failure to timely make a formal response to plaintiff's requests for production.

License to Practice Law

Plaintiff next argues that no attorney-client privilege could have attached to communications between the Stolar lawyers and the Board which retained their services because the Stolar lawyers involved in the investigation are not licensed to practice law in Iowa. Stolar is a St. Louis, Missouri law firm. Assuming the attorney-client privilege does not protect communications between an Iowa client and an attorney not licensed in Iowa who performs legal services in Iowa, Stolar points out its services were undertaken in association with attorney Peter Goplerud who is admitted to practice in the State of Iowa and actively participated. As a result by Iowa Supreme Court rule the Stolar firm was authorized to provide legal services in Iowa on a temporary basis. *See* IRPC 32:5.5(c)(1).

Subject Matter Waiver

Plaintiff's principal argument is that statements by Board president David Miles, the release of the Stolar investigative report and, at the direction of the Board, Stolar's release of its investigation notes have resulted in a subject matter waiver requiring disclosure of the documents withheld by defendants on the ground of attorney-client privilege or work-product protection. The focus is primarily on the attorney-client privilege. That is the sole privilege claimed by the State defendants in their privilege log. (Pl. Motion [69-3] Ex. 6). Stolar's work-product objection is with respect to internal documents it created after it released its report. *See infra* at 15.

Some background is in order. In the fall of 2007 a female University student athlete reported she had been sexually assaulted by a member of the Iowa football team. The victim's family was upset with the University's response. The Board directed Mr. Evans to investigate the University's response and its compliance with policy and procedure. The victim's family remained critical of the University's handling of the matter and expressed their criticism publicly.

At its meeting on July 22, 2008 the Board decided to reopen the investigation. An Advisory Committee (the "Committee") was formed to pursue the inquiry, chaired by Regent and defendant Bonnie Campbell. Through the Committee the Board retained the

Stolar firm "to represent the Committee established by the Board to conduct an investigation of the response and actions of the University of Iowa, its administration, departments and personnel to an alleged sexual assault of a University student/athlete on October 14, 2007." (Pl. Motion [69-4] Ex. 13 at 1). Stolar was to make a written report to include "(i) an assessment of whether the University's relevant policies and procedures were followed; (ii) identification of any problems or concerns with existing procedures; and (iii) preliminary recommendations of changes to policies and procedures to improve same to a 'best practices' status." (*Id.* at 1). In explaining the Board's charge to the Committee, President Miles stated:

> This Board owes Iowans a complete accounting and we will provide it while we will protect the legitimate privacy and other rights of the persons involved. We intend to shine a bright light on this situation. Only by gaining a complete understanding of the events following the alleged assault can this Board respond appropriately.

(Pl. Reply Ex. 15 [92-1] at 4).

Stolar conducted its investigation and presented its report at a September 18, 2008 Board meeting. In introducing the principal Stolar representative present, defendant James Bryant, Committee chair Campbell commented:

> . . . When we embarked upon this effort, we all made a commitment to the people of Iowa that this investigation would be as transparent as humanly possible given the nature of it. It would be independent and it

7

> would be fast, for which I express my thanks to the Stolar Partnership. This is procedurally how things unfolded over the past few weeks -- The Committee was updated by the Stolar team once a week on process. We had literally no input into the results of this investigation. We did, obviously, identify people who were known to us and shared the information that we received from other sources. But as to the content of the report, we have not edited this report in any way. . . .

(Pl. Reply Ex. 16 [92-1] at 19). In fact, the State defendants' lengthy privilege log reveals that Board members and staff had numerous contacts with Stolar representatives during the course of the investigation. (*See* Pl. Motion [69-3] Ex. 6).

Stolar's report was critical of the University and its personnel in many particulars, including the performance of Mr. Mills, the University's General Counsel. The report was accepted by the Board which set a meeting for September 25, 2008 to discuss it further. (Pl. Reply Ex. 16 [92-1] at 35). The Stolar report was released to the public. In the follow-up September 25 meeting the Board adopted a number of the Stolar report recommendations. At the conclusion of the meeting President Miles noted Stolar had been asked to provide its notes from the investigation. The Board minutes reflect President Miles

> . . . said that the sense of the Board is that it wants those notes to be disclosed to the fullest extent possible, and . . . that the Board would waive its privilege and allow The Stolar Partnership to share the notes to the

> fullest extent possible as long as the statutory commitment to protect the privacy rights of students is honored.

(Pl. Motion Ex. 14 [69-4] at 15). Stolar then released the notes.

The Board intended to waive any attorney-client privilege or work-product protection which might have pertained to the content of the Stolar report and notes, by clear implication as to the report[1] and expressly as to the notes. By producing its notes Stolar also waived any independent work-product objection it might have had to disclosure of the notes. The questions at this point are whether these waivers have resulted in a subject matter waiver with respect to Stolar's investigation and if so, the scope of the waiver.

The Board (principally through the Committee and staff) and Stolar were in frequent contact during the course of the investigation. It is evident from plaintiff's motion papers that he is concerned with finding out if these contacts influenced Stolar's investigation to any extent which would reflect on the independence of Stolar's work.

For the present the Court will assume that absent waiver the documents which are the subject of defendant's attorney-client and work-product objections would be protected from disclosure.

---

[1] Neither the attorney-client privilege nor work-product protection would have attached to the Stolar report because from the outset the report was not intended to be a confidential communication by attorney to client, nor was it created because of the prospect of litigation.

9

Federal Rule of Evidence 502 passed by act of Congress in 2008[2] pertains to the scope of attorney-client privilege and work-product protection waivers. In relevant part the rule states:

> (a) **Disclosure made in a Federal Proceeding or to a Federal Office or Agency; Scope of a Waiver.** When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
>
> > **(1)** the waiver is intentional;
> >
> > **(2)** the disclosed and undisclosed communications or information concern the same subject matter; and
> >
> > **(3)** they ought in fairness to be considered together.

Fed. R. Evid. 502(a). The waivers resulting from the disclosure of the Stolar report and notes occurred prior to the commencement of this proceeding but the Court believes the rule nonetheless provides an appropriate framework for guidance. It strikes a considered balance between the competing interests in protecting attorney-client communications and work-product on the one hand and the search for truth on the other. Subject matter waiver has always been about fairness to all parties, ensuring the full story emerges, and concern about the impact of selective disclosure on

---

[2] Pub. L. 110-322 § 1(a), September 19, 2008, 122 Stat. 3537. The rule applies to all proceedings commenced after the September 19, 2008 date of enactment. *Id.* § 1(c).

the fact-finding process. *See Miller v. Continental Ins. Co.*, 392 N.W.2d 500, 504-05 (Iowa 1986); 1 E. Epstein, *The Attorney-Client Privilege and the Work-Product Doctrine* at 584-89 (5th ed. 2007); *see also Union County, Iowa v. Piper Jaffray & Co., Inc.*, 248 F.R.D. 217, 224 (S.D. Iowa 2008)(noting in an implied waiver case the importance of "fairness and consistency" in evaluating attorney-client waiver claim, citing *Sedco Int'l v. Cory*, 683 F.2d 1201, 1206 (8th Cir. 1982)).

The attorney-client and work-product waivers with respect to the Stolar report and notes were intentional.[3] It is also fair to assume for the present that some, perhaps most, of the undisclosed communications for which privilege has been claimed concern the same subject matter as the Stolar report and notes -- the University's response to the alleged sexual assault. The question resolves itself to the third element, fairness.

The Advisory Committee notes to subdivision (a) of the rule indicate that subject matter waiver is the exception, not the rule, reserved for circumstances in which failure to recognize a subject matter waiver would give unfair advantage to the objecting party.

> . . . [A] subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related,

---

[3] Under Rule 502 the waiver, not merely the disclosure, must be intentional.

11

> protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary. . . . Thus, subject matter waiver is limited to situations in which a party intentionally puts protected information into the litigation in a selective, misleading and unfair manner.

There is no reason to believe the State defendants or Stolar have sought to mislead or secure unfair advantage by waiving privilege and protection for the Stolar report and notes while objecting to a broader disclosure. There is not much case law on Rule 502, but one court has observed the Advisory Committee notes should not be taken to mean that in addition to a waiver being intentional, it must also be made "in a selective, misleading and unfair manner" for a subject matter waiver to result. *Bear Republic Brewing Co. v. Central City Brewing Co.*, 275 F.R.D. 43, 48 (D. Mass. 2011). After all, "[t]he Advisory Committee note is not the law, the rule is." *Id.* (quoting *United States v. Carey*, 120 F.3d 509, 512 (4th Cir. 1997), *cert. denied*, 522 U.S. 1120 (1998)). This Court agrees with the *Bear Republic* court to the extent that while a party's disclosure of privileged matter "in a selective, misleading and unfair manner" is certainly relevant to the fairness inquiry, it is not essential under the plain language of the rule. At the same time, fairness limits scope. The rule clearly disfavors broad subject matter waivers.

For two reasons the Court believes fairness dictates that what passed between Board members or staff and Stolar between the July 22, 2008 Board meeting and the September 18, 2008 Board meeting concerning the scope, conduct, and subject of the investigation should be disclosed under a limited subject matter waiver. First, such disclosure is consistent with the announced purpose of the intentional waiver pertaining to the Stolar report and notes -- to be completely open and transparent about the conduct of the investigation and its independence. Second, though the Committee, through Ms. Campbell, has disclaimed any influence on the content or outcome of the investigation, the Committee did provide information to Stolar during the investigation and Stolar updated the Committee weekly on its work. Frequent communication and exchange of information affords an opportunity for influence, even unintended, which disclosure may rule out or support. Mr. Mills was fired as a result of the findings and conclusions in the Stolar report. He alleges these were in material respects untrue and defamatory; that he was a scapegoat. The integrity of the report is thus in issue. With the report and investigative notes in the domain of the case, Mr. Mills is entitled to discover the complete picture of what Stolar may have learned from the Board during the investigation.

The Court will **grant** the motion to compel the disclosure of undisclosed communications and information that passed between any member of the Board or its staff and the Stolar firm from July 22, 2008 to September 18, 2008 which relate or refer to the following: (1) the purposes, scope, or direction of the investigation; (2) information provided or requested pertaining to the subject matter of the investigation; (3) the identification of persons who were involved in the subject matter of the investigation and any information concerning their involvement including specifically any mention of Mr. Mills; (4) any kind of assistance in the conduct of the investigation; or (5) the progress of the investigation including specifically progress reports.

The Court cannot tell from the privilege log what documents on the log would be subject to disclosure under this ruling. The State defendants and Stolar shall review the documents on the privilege log and produce those subject to disclosure under this ruling. At a defendant's request the Court would undertake a pre-disclosure *in camera* review of documents concerning which the defendant is uncertain if within the scope of this ruling. If, after the disclosure of additional documents as a result of this ruling, a party believes it would be appropriate for the Court to review *in camera* documents still being withheld on the basis of a claim of attorney-client privilege the Court would consider doing so.

Specifically on the subject of Stolar's work-product objections, the Court notes Stolar states it has not asserted work-product protection with respect to any documents it created or received before it presented its report to the Board in the Board meeting of September 18, 2008. By that point, it was reasonable for Stolar to anticipate litigation resulting from its report in which it might well be involved. Any documents created by Stolar after it presented its report would not likely shed any light on what influence, if any, the Board may have had on Stolar's work, plaintiff's chief concern concerning the withheld documents. In the absence of a showing of substantial need for Stolar's post-report internal documents, there is no basis for the Court to order disclosure or to undertake an *in camera* review of the documents. Fed. R. Civ. P. 26(b)(3)(A)(ii).

Plaintiff's motion to compel [69] **granted in part and denied in part** in conformity with the foregoing. To the extent granted the State defendants and Stolar shall, within twenty (20) days, review the documents subject to their claims of attorney-client privilege and produce those within the scope of this ruling not later than twenty (20) days from the date hereof, and present for *in camera* review any documents concerning which defendants are uncertain if within the scope of this ruling.

The motion having been granted in part and denied in part, the Court elects not to undertake an apportionment of the parties' expenses incurred in connection with the motion. Fed. R. Civ. P. 37(a)(5)(C).

IT IS SO ORDERED.

Dated this 28th day of August, 2012.

ROSS A. WALTERS
UNITED STATES MAGISTRATE JUDGE